UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:

UNITED STATES OF AMERICA

:

     -v.-                           **S2 11 Cr. 986 (GBD)**

:

BORIS LISYANSKY,

:

             Defendant,

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Alexander Wilson
Harris Fischman
Assistant United States Attorney
- Of Counsel -

The Government respectfully submits this sentencing memorandum in advance of the sentencing of defendant Boris Lisyansky, scheduled for June 25, 2014, at 10:00 a.m., and in response to the Sentencing Memorandum Submitted on Behalf of Boris Lisyansky filed on June 13, 2014 ("Memo").  The defendant, who was convicted after trial of murder for hire and conspiracy to commit murder for hire, has a United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 360 months' to life imprisonment, and a statutory maximum sentence of 240 months' imprisonment.  A sentence of 240 months is sufficient, but not greater than necessary, to serve the purposes of sentencing.  Therefore, the Government respectfully requests that the defendant be sentenced to 240 months' imprisonment, as recommended by the Probation Office.

## BACKGROUND

### I.    The Indictment

The Indictment in this case charges the defendant with one count of murder for hire and one count of conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958. The defendant was found guilty after trial by jury on April 29, 2013.

### II.    The Offense[1]

In May 2010, the defendant hired Jesus Rosa ("Rosa") to kill Ilya and Mikhail Zavolunov, a father and son who owned the Da Mikelle restaurant in Queens. (PSR ¶ 9).  In exchange for committing those murders, the defendant offered Rosa $24,000. (Id.)   Prior to the intended murders, the defendant obtained a gun for Rosa to use from Torrance Crayton, a/k/a

---

[1] As the Court presided over the trials of both Jayson Vazquez-Soto and Boris Lisyansky, the Government presents a brief summary of the offense conduct rather than recounting all the relevant events in detail.

"King Blood," an individual who sometimes worked for the defendant and his partner, Eugene Kohanov ("Kohanov"), at a jewelry store in Manhattan.  (Trial Transcript ("Tr.") at 273-275.) After an aborted attempt on May 26, 2010, the defendant and Rosa went to Da Mikelle on May 27, 2010, driven by co-defendant Jason Vazquez-Soto.  (PSR ¶¶ 9-10.)  The defendant had arranged a meeting with the intended victims that day, under the false pretense that he was interested in having his wedding at Da Mikelle.  (Id.)

Once the intended victims had arrived, the defendant called Vazquez-Soto's phone and spoke to Rosa, informing him that it was time for him to come and murder the victims.  (PSR ¶ 10.)  Rosa then went into Da Mikelle and took Ilya Zavolunov's watch as directed by the defendant.  (Id.) But Rosa had a change of heart and did not kill him, as planned. Instead, Rosa shot him in the leg in order to disable him, and ran out of the restaurant and back towards the getaway car.  (Id.)  Mikhael Zavolunov pursued Rosa, and Rosa fired two bullets back at him as he ran, before entering the getaway car and fleeing the scene with Vazquez-Soto (PSR ¶ 11.)  When officers from the New York City Police Department ("NYPD") arrived at the scene, Lisyansky lied to the detective about the ethnicity of the shooter, claiming it was a "white man." (Tr. at 200.)

Rosa and Vazquez-Soto drove to the defendant's apartment in Brooklyn, where Rosa stashed the gun (PSR ¶ 12; Tr. at 297; Transcript of the Trial of Jayson Vazquez-Soto ("JVS Tr.") at 220; 280).   Then they took cleaning supplies and used them to clean the vehicle in an attempt to get rid of any fingerprint evidence.  (PSR ¶ 12.)  Rosa testified at trial that Vazquez-Soto had told him that Kohanov had directed them to clean the car, while Vazquez-Soto told law enforcement officers in October 2010 that he and Rosa were instructed to clean the

2

car by the defendant.  (Tr. at 297-298; JVS Tr. at 220-221; 280-281.)   Once the car had been

cleaned, the defendant directed Vazquez-Soto to move the car away from his apartment and

abandon it elsewhere in Brooklyn.  (PSR ¶ 12.)  The defendant also instructed Rosa to give

Vazquez-Soto the watch he had taken from Ilya Zavolunov, which Vazquez-Soto then brought to

Kohanov.  (PSR ¶ 12; Tr. at 301.)

       That same night, Vazquez-Soto fled New York for Puerto Rico.  (PSR ¶ 13.)

Lisyansky told Rosa to get out of town as well, and provided him with $1,000 in cash.  (PSR ¶

14.) When Rosa asked for more, Lisyansky sent his then-wife to meet Rosa and give him another

$5,000 in cash.  (Id.)

       Lisyansky was subsequently arrested on unrelated charges on June 23, 2010.

(PSR ¶ 15.)  He was interviewed at the time regarding the shooting, and once again lied about the

shooter's identity, claiming this time that the shooter was "Italian."  (Tr. at 630.)  The defendant

also repeatedly lied about owning a cell phone, as well as falsely denying that he had any role in

the shooting.  (Tr. at 203, 630, 683.)

## III.    The Defendant's Criminal History

       For a decade prior to the instant offense, the defendant engaged in a steady pattern

of criminal activity.  On April 26, 2000, he was arrested in connection with a fraudulent scheme

in New Jersey, which ultimately resulted in a conviction for theft by deception, and a sentence of

9 months' imprisonment.  (PSR ¶¶ 31-32.)  While that case was pending, in November and

December 2000 the defendant stole more than $50,000 worth of gold pieces. (PSR ¶ 34.) He was

arrested on June 20, 2001, and ultimately convicted on May 2, 2002 of criminal possession of

stolen property in the second degree in New York County Supreme Court.  (PSR ¶¶ 33-34.)  The defendant was sentenced to 3 to 9 years' imprisonment, and paroled in May 2005. (PSR ¶ 33.)[2]

From 2006 to August 2007, while on parole, the defendant engaged in a bank fraud scheme in which he defrauded mortgage lenders of more than $1 million. (PSR ¶ 41.)   In connection with that scheme, the defendant also engaged in multiple acts of extortion, including threatening to kidnap the child of a developer that had refused to provide him with kickback payments.  (PSR ¶ 42).  From January 2009 through July 2009, the defendant also trafficked in smuggled cigarettes.  (Id.)  After the defendant and Rosa were released from Edgecombe in March 2009, the defendant recruited Rosa to participate in the cigarette trafficking scheme.  (Tr. at 262-263.)  At around this time, the defendant also asked Rosa to rob a medical clinic owner who the defendant claimed owed him money.  (Tr. at 263-265.)  The defendant provided Rosa with an unloaded machine gun, and instructed him to go into the clinic and steal a diamond ring worn by the medical clinic owner by threatening him with the gun.  (Id.) Rosa did as instructed, and gave the ring to the defendant.  (Id.)

The defendant was ultimately arrested on June 23, 2010 on federal charges stemming from the bank fraud and extortion scheme and the cigarette trafficking scheme.  (PSR ¶ 40.)  The defendant pled guilty on March 18, 2011 and was sentenced on July 29, 2011 by United States District Judge Victor Marrero to 51 months' imprisonment.  (Id.)

---

[2]  In December 2008, the defendant was arrested for driving while impaired by the consumption of alcohol, and in February 2009 he was placed in a 30 day residential treatment program at Edgecombe Correctional Facility in lieu of violation of his parole.  (See PSR ¶¶ 35-37).  The defendant met Rosa during his time at Edgecombe.

**IV.     The PSR and Guidelines Calculation**

The Probation Office has calculated a total offense level of 37 and a Criminal History Category of IV, which leads to a Guidelines range of 292-365 months' imprisonment.  (PSR ¶ 72.)  Applying a statutory maximum sentence of 240 months on both counts, [3] however, the Probation Office determined that the Guidelines sentence would be 240 months, pursuant to U.S.S.G. § 5G1.1(a).  (Id.)

The Probation Office reached its calculation by applying U.S.S.G. § 2E1.4 (Use of Interstate Commerce Facilities in the Commission of Murder for hire) which requires that the Guidelines section for the underlying unlawful conduct be used if it results in an offense level greater than 32. U.S.S.G. § 2E1.4(a).  The Probation Office determined that the underlying unlawful conduct was Conspiracy or Solicitation to Commit Murder, and applied U.S.S.G. § 2A1.5, the applicable Guideline for that conduct.  The Government agrees with the Probation Office that U.S.S.G. § 2A1.5 is the appropriate section to apply here. As discussed further below,

---

[3] Defense counsel has argued, based on the Apprendi case and its progeny, most recently Alleyne v. United States, 113 S. Ct. 2151(2013), that the Court must apply a 10-year statutory maximum for each count, rather than the 20-year maximum for murder-for-hire where personal injury resulted, because the jury was neither charged on personal injury as an element of the crime nor asked to make a finding regarding personal injury.  This would be a somewhat perverse result in a case such as this, where the fact that a personal injury resulted was charged in the Indictment and was never in dispute at trial, and where the defense never requested that the jury be charged on personal injury.  When such an argument has been raised for the first time on appeal, the Second Circuit has upheld applying the higher maximum based on a plain error standard.  See United States. v. Henry, 325 F.3d 93, 102-103 (2d Cir. 2003) (citing United States v. Cotton, 535 U.S. 625 (2002)); United States v. Doe, 297 F.3d 76, 91–92 (2d Cir. 2002); United States v. Guevara, 298 F.3d 124, 126–27 (2d Cir. 2002).  The Government has not, however, identified any case law supporting the application of the plain error standard when the defendant raises an Apprendi objection after trial, but before sentencing.  Accordingly, the Government concedes that the Court should apply a 10-year statutory maximum for each count in this case

the Government also believes a two level enhancement for obstruction of justice would be warranted under U.S.S.G. § 3C1.1, resulting in a total offense level of 39 and a Guidelines range of 360 to life.  The Government agrees with the Probation Office, however, that the lower statutory maximum of 240 months is the Guidelines sentence applicable here.

## V.     Restitution

The PSR indicates that restitution is not applicable here.  (PSR at 20 (Sentencing Recommendation).)  The Government disagrees and requests that restitution be awarded in the amount of Ilya Zavolunov's medical expenses as a result of the shooting on May 27, 2010.  In the case of "an offense resulting in bodily injury to a victim," the Court is to order restitution in "an amount equal to the cost of necessary medical and related professional services and devices[.]"  18 U.S.C. §3663A(b)(2).  The Government is awaiting records from Mr. Zavolunov regarding the medical expenses incurred as a result of his injuries, and requests an additional 90 days to make a final submission to the Court setting forth the appropriate restitution amount.

## DISCUSSION

## I.     Applicable Law

The United States Sentencing Guidelines still provide strong guidance to the Court following United States v. Booker, 543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  Booker, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range" — that "should be the starting point and the initial

benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007).

After making the Guidelines calculation, a sentencing judge must consider seven

factors outlined in Title 18, United States Code, Section 3553(a)(1)-(7): "the nature and

circumstances of the offense and the history and characteristics of the defendant";  the four

legitimate purposes of sentencing; "the kinds of sentences available,";  the Guidelines range

itself; any relevant policy statement by the Sentencing Commission; "the need to avoid

unwarranted sentence disparities among defendants"; and "the need to provide restitution to any

victims."  See Gall, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing,

which are:

> (A)      to reflect the seriousness of the offense, to promote respect for the law,
>          and to provide just punishment for the offense;
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and
>
> (D)      to provide the defendant with needed educational or vocational training,
>          medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

"While a fact-finder is required to find guilt beyond a reasonable doubt, the

sentencing court may find facts relevant to sentencing by the lower preponderance of the

evidence standard."  United States v. Yannotti, 541 F.3d 112, 129 (2d Cir. 2008) (citation

omitted); see also United States v. Vaughn, 430 F.3d 518, 525 (2d Cir. 2005) (reiterating that district courts' authority to determine sentencing factors by a preponderance of the evidence survives the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005)).  The Second Circuit has expressly rejected "applying a different evidentiary standard to relevant facts merely because they constitute a separate offense, so long as those facts do not increase the maximum statutory punishment to which a defendant is exposed." United States v. Martinez, 525 F.3d 211, 215 (2d Cir. 2008).

## II.    The Court Should Apply the Guidelines Based on the Underlying Unlawful Conduct of Conspiracy or Solicitation to Commit Murder.

The defendant concedes that the Guideline applicable here is U.S.S.G. § 2E1.4, which provides that the offense level for use of interstate commerce facilities in the commission of murder for hire is 32 or "the offense level applicable to the underlying unlawful conduct," whichever is greater. U.S.S.G. § 2E1.4(a). While the underlying unlawful conduct here could plausibly be viewed as attempted murder, the Government believes that conspiracy or solicitation to commit murder more closely fits the defendant's conduct.  The defendant, by contrast, argues that any use of an offense level applicable to the underlying unlawful conduct, as provided for by U.S.S.G. § 2E1.4(a)(2), would violate the Constitution and is not authorized by

Congress's grant of authority to the United States Sentencing Commission. These arguments are meritless.[4]

### A.  The Underlying Unlawful Conduct

In connection with this offense, the defendant hired Rosa to murder Ilya and Mikhael Zavolunov, provided him with a gun to commit the murders, arranged the meeting at which the murders was to take place, and brought Rosa to Da Mikelle to commit the murders. (See supra pgs. 1-3.)   To find the defendant guilty of murder for hire and conspiracy to commit murder for hire, the jury was required to find that the defendant and Rosa intended that at least one murder be committed, and conspired with each other to cause that murder. (Tr. at 1097-1101 (jury charge on elements).)  In particular, the jury was required to find beyond a reasonable doubt that between the defendant and Rosa there was "a mutual agreement, understanding, or promise that something of value would be exchanged for committing the murder." (Id. at 1099.)

By convicting the defendant, therefore, the jury necessarily found that the defendant offered Rosa something of value to commit murder, and that the defendant and Rosa agreed and conspired to do so.  Accordingly, the unlawful conduct underlying the defendant's use of a cell phone in connection with the murder for hire plot is properly viewed as conspiracy or solicitation to commit murder.  The relevant Guideline applicable to conspiracy or solicitation

---

[4]  The defendant also argued that the trial evidence would not support a finding by a preponderance of the evidence that attempted murder was the underlying unlawful conduct.  In support of that argument, the defense relied solely on the arguments laid out in the defendant's Rule 29 and Rule 33 motions regarding the supposed insufficiency of the Government's evidence, which have been repeatedly rejected by both the jury, in its verdict, and the Court, in its denial of the Rule 29 and Rule 33 motions.

to commit murder is U.S.S.G. § 2A5.1, which results in an offense level of 37 and a Guidelines range of 292-365 months' imprisonment, as set forth by the Probation Office.

One could also plausibly view the underlying unlawful as attempted murder. As the jury necessarily found, Lisyansky and Rosa intended to murder the Zavolunovs. Moreover, by arranging the ambush on May 27, 2010 and going to Da Mikelle with a gun for the purpose of carrying out the murder, both Lisyansky and Rosa clearly took substantial steps to achieve the murders. On that view, the relevant offense level would be that applicable to attempted murder, U.S.S.G. § 2A2.1, with a resulting offense level of 39, and a Guidelines range of 360 months to life.[5]

Rosa ultimately terminated the murder plot, however, shooting Illya Zavolunov only with intent to injure him rather than to murder him. In light of that fact, the Government believes that attempted murder is less analogous to the defendant's conduct that conspiracy or solicitation to commit murder. Moreover, because the Guidelines range for attempted murder would be higher, considerations of lenity support the use of the conspiracy or solicitation offense.

### B. Applying the Underlying Unlawful Conduct Offense Level Does Not Violate the Defendant's Right to a Jury Trial.

The defendant argues that applying the offense level for the underlying offense conduct under U.S.S.G. § 2E1.4(a)(2) violates his right to a jury trial as set forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and its progeny because it constitutes "sentencing the

---

[5] A base offense level of 33 (U.S.S.G. §2A2.1(a)(1)), plus a two level enhancement for the serious bodily injury sustained by the victim (U.S.S.G. §2A2.1(b)(1)(B)), plus a four level enhancement for involving an offer of something of pecuniary value. (U.S.S.G. §2A2.1(b)(2)).

defendant for conduct for which he was neither charged nor convicted." (Memo at 11.) This argument is expressly foreclosed by Second Circuit precedent.

A sentencing court is clearly entitled to "find facts relevant to sentencing by the lower preponderance of the evidence standard." Yannotti, 541 F.3d at 129. The Court's sentence need not be based solely on conduct for which a defendant was "charged or convicted," but may take into account other relevant conduct as found by the Court. See Vaughn, 430 F.3d at 526-28. Indeed, the Second Circuit has expressly ruled, after Apprendi and Booker, that the sentencing court may even consider acquitted conduct in determining the appropriate sentence, if it finds such conduct occurred by a preponderance of the evidence and it does not increase the statutory maximum or mandatory minimum sentence. Id.; see also United States v. Shahid, 486 Fed.Appx. 915, 916-917 (2d Cir. 2012) (summary order) (following Vaughn). No constitutional violation occurs, in short, when a court "sentence[s a defendant] within the statutory range authorized by the jury verdict and within the Guidelines range determined in accordance with the facts the court found by a preponderance of the evidence." Vaughn, 430 F.3d at 527.

The fact that the Guidelines direct the Court to look to what separate federal offense most resembles the underlying unlawful conduct here does not alter this analysis. In United States v. Martinez, the Second Circuit addressed a defendant's contention that the Court's determination of relevant facts based on the preponderance of the evidence violated his rights where "the enhancement applied to his base offense level required the district court to determine that he had committed a new and separate offense." 525 F.3d at 214. The Second Circuit rejected that argument, finding that the sentencing court was entitled to find relevant facts constituting a separate offense by a preponderance of the evidence, "so long as those facts do not

increase the maximum statutory punishment to which a defendant is exposed." <u>Id</u>. at 215. The Second Circuit specifically denied the very claim made by the defendant here that this procedure constitutes sentencing the defendant for a different crime than the crime for which he was convicted:

> However, as in <u>Vaughn</u>, Martinez's argument "misses the distinction between elements of an offense and facts relevant to sentencing." The district court did not sentence Martinez for the separate offense; rather that separate offense was relevant to the sentence imposed based on Martinez's [offense of conviction]. Martinez's sentence, moreover, was not in excess of the 10-year [statutory maximum].

<u>Id</u>. at 215.  Similarly, the Second Circuit expressly adopted the holding of the Third Circuit in <u>United States v. Grier</u>, that "like all facts relevant to application of the Guidelines, facts that constitute a separate offense do not implicate the rights to a jury trial and proof beyond a reasonable doubt because, under an advisory Guidelines system, those facts do not increase the maximum punishment to which a defendant is exposed. <u>Id</u>. at 214 (<u>citing</u> <u>United States v. Grier</u>, 475 F.3d 556, 567-68 (3d Cir. 2007).)

As noted above, the jury verdict necessarily established that the defendant's underlying unlawful conduct amounted to solicitation and conspiracy to commit murder.  Even if it had not, however, the Second Circuit's decisions make abundantly clear that the defendant's constitutional rights are not violated by this Court making its own finding to that effect based on

12

a preponderance of the evidence.[6]  Accordingly the defendant's arguments to the contrary should be rejected.

### C. The Court Is Authorized to Consider Relevant Conduct Such as the Defendant's Underlying Offense Conduct.

The defendant also argues that the Sentencing Reform Act did not authorize the United States Sentencing Commission to issue Guidelines that permitted the consideration of "relevant conduct" or other uncharged or acquitted conduct by the defendant, and that the use of such conduct by the Court here via the offense level for the underlying unlawful conduct would be improper.  (See Memo at 15-19.)   As the Second Circuit cases cited above amply demonstrate, however, reliance on relevant uncharged conduct, and even acquitted conduct, is entirely proper.  Indeed, courts have regularly applied the offense level for unlawful conduct underlying a murder for hire conviction.  See, e.g., United States v. Dan, 205 F.3d 1325 (2d Cir. 1999) (summary order) (murder under U.S.S.G. §2A2.1); United States v. Vasco, 564 F.3d 12, 23 (1st Cir. 2009) (conspiracy or solicitation to commit murder under U.S.S.G. §2A1.5); United States v. Dotson, 570 F.3d 1067, 1069-1070 (8th Cir. 2009) (conspiracy or solicitation to commit murder under U.S.S.G. §2A1.5); United States v. Maldonado, No. 09 Cr. 339–02, 2012 WL 5878673, *7 -8 (S.D.N.Y. Nov. 21, 2012) (murder under U.S.S.G. §2A2.1).

---

[6]  The defendant's effort to enlist Alleyne as authority for his position is unavailing, as the Supreme Court in Alleyne reaffirmed the permissibility of relying on judicial fact-finding in determined where to sentence a defendant "within the range prescribed by statute."  113 S. Ct. at 2163 (quoting Apprendi, 530 U.S. at 519).  The determination of the appropriate offense level does not alter the statutory range of 0 to 10 years on each count, and so is entirely consistent with Alleyne.

**III.     The Court Should Apply the Obstruction of Justice Enhancement.**

The Government believes that a two-level enhancement is warranted here for obstruction of justice under U.S.S.G. §3C1.1.  Conduct covered by that adjustment includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation."  (U.S.S.G. §3C1.1 app. note 4(D).)  A preponderance of the evidence introduced at the trials of the defendant and Vazquez-Soto shows that the defendant (1) instructed his co-conspirators to destroy fingerprint evidence, either directly or through his partner, Eugene Kohanov; (2) disposed of or caused someone else to dispose of the gun used at the shooting which Rosa stashed at the defendant's house; (3) caused Vazquez-Soto to deliver the watch taken from the victim to Kohanov, and then disposed of or caused someone else to dispose of the watch; and (4) directed Vazquez-Soto to conceal the getaway car.  This conduct qualifies as obstruction under the U.S.S.G. §3C1.1, and indeed Vazquez-Soto was convicted by a jury of the substantive crime of obstruction of justice.  The defendant also repeatedly lied to law enforcement about the identity of the shooter prior to Rosa's arrest.  That fact was material, and significantly impeded law enforcement by preventing them from identifying, locating and arresting Rosa for almost two months.  (See U.S.S.G.

§3C1.1 app. note 4(G).) [7]  Accordingly, the Court should apply the obstruction of justice

adjustment, leading to an offense level of 39 and a Guidelines range of 360 months' to life

imprisonment.

## IV.    The Court Should Impose Consecutive Sentences.

Where the defendant is convicted of multiple counts, and the total punishment

called for by the Guidelines and the 18 U.S.C. § 3553(a) factors exceeds the statutory maximum

sentence on any one count, the district court should impose consecutive terms of imprisonment

to the extent necessary to achieve the appropriate sentence. See United States v. Evans, 352 F.3d

65, 71 (2d Cir. 2003); United States v. McLeod, 251 F.3d 78, 83 (2d Cir. 2001); U.S.S.G. §

5G1.2(d); 18 U.S.C. §3584. The Second Circuit has made clear that this rule should be followed

in the exact situation presented here, where the two counts of conviction are for a murder for hire

offense and a conspiracy to commit that murder for hire offense. United States v. Kapaev, 199

F.3d 596, 598 (2d Cir. 1999); see also United States v. Guglielmo, 307 Fed.Appx. 575, 577 (2d

Cir. 2009) (summary order) (finding Kapaev still applies post-Booker).  While the defendant

argues that 28 U.S.C. § 994(l)(2) should militate against consecutive sentences, that very

---

[7] In addition, as the Court is aware, the Government sought to introduce evidence at trial that the defendant attempted to unlawfully intimidate and/or influence three trial witnesses: Rosa, Alla Bernstein, and Victoriya Kim.  (See Tr. 114-124).  The Court excluded the evidence as more unduly prejudicial than probative at trial.  The Government does not believe that this evidence is necessary for the Court to conclude that the obstruction of justice enhancement applies, given the evidence from the trial record, and is not inclined to further delay the defendant's sentencing with additional fact-finding.  Even if the Court disagrees with the Government on this point and instead adopts the Probation Office's Guidelines calculation, the Government feels presentation of additional evidence would be a waste of judicial resources, as the Guidelines range would already significantly exceed the statutory maximum.  If, however, the Court adopts the defendant's view that the underlying unlawful conduct may not be considered, and does not believe the trial evidence alone supports the obstruction of justice enhancement, the Government would request the opportunity to present the evidence of witness tampering to the Court.

argument was rejected in <u>Kapaev</u>, 199 F.3d at 598.  It would be particularly inappropriate for the Court to artificially restrict the sentence to the 10 year statutory maximum sentence of a single count here, where the statutory sentencing enhancement for personal injury that would raise the maximum to 20 years is factually undisputed, albeit not expressly found by the jury.  As set forth below, a sentence of 240 months, as recommended by the Probation Office, is the appropriate sentence in light of all the sentencing factors, and the Court should impose consecutive sentences to effectuate that total punishment.

## V.      A Sentence of 240 Months' Imprisonment is Appropriate.

A sentence of 240 months' imprisonment is sufficient to but not greater than necessary to serve the purposes set forth in 18 U.S.C. § 3553(a). The defendant sought to have two people murdered, and did everything in his power to ensure that those people.  The fact that the man the defendant chose to pull the trigger proved unreliable does nothing to reduce the defendant's culpability.  A sentence of 240 months is necessary for purposes of just punishment for this calculated, cold-blooded crime.

Moreover, both the instant offense and the defendant's criminal history indicate that a 240 month sentence is needed to protect the public from further crimes of the defendant, and to deter him from future offenses.  Throughout the 10 years prior to his arrest in June 2010, the defendant engaged in a steady stream of criminal activity, ranging from significant, if non-violent, financial crime, to threatening to kidnap a child to extort money from a parent, to planning a robbery at gunpoint.  He engaged in new crimes almost immediately after being arrested or incarcerated on earlier charges, including while on parole.  And he concluded by

plotting multiple murders.  The public's safety therefore demands a lengthy period of incarceration.

The defendant argues that he is entitled to a lesser sentence because the Government charged him with murder for hire only after he was sentenced for his crimes in connection with the bank fraud scheme and cigarette trafficking scheme.  Those offenses, however, were totally unrelated to the murder plot.  The bank fraud, and related extortion, occurred in 2006 and 2007, three to four years before the murder plot.  Even the cigarette trafficking scheme was completed a year before the shooting.  That case was investigated and presented to the grand jury long before the Government had evidence that the defendant was part of a murder for hire plot.  When the defendant commits a string of unrelated crimes over a four year period, he is not unfairly prejudiced when the Government investigates, solves and prosecutes those crimes at different speeds.[8]

Moreover, contrary to the defendant's suggestion, a joint sentencing on all the charges would have actually increased his exposure, rather than the reverse.  Because the statutory maximum for bank fraud is 30 years, the defendant would be facing a Guideline sentence of 360 months, rather than merely 240 months.  See 18 U.S.C. § 1344.  Even excluding the obstruction of justice enhancement, the defendant would be facing a Guidelines range of 292-

---

[8] The defendant appears to imply that he was misled by the Government into pleading guilty to the earlier charges in 2011, noting that his counsel asked the Government before the plea whether he was the target of other criminal investigations.  Notably, he fails to disclose the answer the Government provided.  In fact, while the lead prosecutor in the bank fraud case declined to respond regarding whether the defendant was the target of any ongoing investigation, he expressly noted that the defendant had been interviewed by the FBI in connection with the shooting at Da Mikelle.  In other words, the defendant was well aware at the time he pled guilty that the Government could be considering charges against him related to Da Mikelle.

360 months, with a preference for the top of the Guidelines range, based on the myriad counts of conviction that would not have increased the offense level under the grouping analysis.  (See U.S.S.G. §3D1.4(c).)  Combining the 51 months served by the defendant on his prior federal convictions with a 240 month sentence would still only total 291 months, less than the bottom of the Guideline range he would have faced even without the obstruction enhancement.

   The defendant also argues that his immigration status warrants a lesser sentence because (1) he will not be eligible for early release as a result of entering a drug and alcohol treatment program, and (2) he may spend up to 90 days in ICE custody at the end of his sentence while he is processed.  The defendant is not eligible for early release, however, because he was convicted of "an offense that has as an element the actual, attempted or threatened us of physical force against the person [] of another."  BOP Program Statement 5331.02 § 550.55(b)(5)(i).  His immigration status is irrelevant, and no consideration is warranted for the fact that his crime is too egregious to allow for early release.  Nor does a limited stay in ICE custody warrant any reduction below the Guidelines sentence.  The defendant has apparently had the benefit of living in the United States for years despite being under an order of removal since 2005, and may well continue to have that benefit after his release despite his conviction for murder for hire.  That more than offsets the disadvantage of spending 90 days in ICE custody while he is processed.

   Finally, the defendant's personal background provides no basis for leniency.  He points to numerous letters written by his family attesting to his positive qualities as a family member.  Notably, these letters appear to have been written in connection with his sentencing on the bank fraud charges, rather than now that he has been proven guilty of murder for hire.  None of them provide any information that mitigates his attempts to murder two people in cold blood,

or that can reassure the Court that he would not readily return to violence.   The defendant's own letter to the Court is particularly telling.  While he expresses remorse for "the problems he has brought to [his] family" repeatedly, and notes that he "never want[s] to put [him]self or [his] family through the turmoil from it ever again," there is not a word of remorse for what he did to Ilya Zavolunov.  (Memo Ex. 10.)  The defendant does not express the slightest regret that he caused a man to be shot, or the slightest concern for his victim's suffering as a result.

Due to the statutory maximum, a Guidelines sentence of 240 months is well below the applicable Guidelines range of 360 months to life.  No lesser sentence is sufficient to protect the public and provide just punishment for the offense.  Accordingly, the Court should impose a sentence of 240 months imprisonment.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court impose the Guidelines sentence of 240 months' total imprisonment, with 120 months' imprisonment on each count to be served consecutively.

Dated: June 24, 2014
New York, New York

Respectfully submitted,

PREET BHARARA
United States Attorney

By:___ /s/ *Alexander Wilson*_____
Alexander Wilson
Harris Fischman
Assistant United States Attorney
Tel:  (212) 637-2453/2305
Fax: (212) 637-0421

19

**Certificate of Service**                                                  **Electronically**

The undersigned attorney, duly admitted to practice before this Court, hereby certifies that on the below date, he served or caused to be served the following document in the manner indicated:

       **Government's Sentencing Memorandum**

Via ECF upon the following attorneys:

       Melinda Sarafa, Esq.
       Beth Farber, Esq.

Dated: June 24, 2014
       New York, New York

                                         _____/s/ *Alexander Wilson*_____
                                         Alexander Wilson